UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANGELINA GURZENDA,

        Plaintiff,

    v.

ANDREW SAUL,

        Defendant.

Case No. 18-cv-00488-JCS

**ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 23, 29

## I.    INTRODUCTION

Plaintiff Angelina Gurzenda brought this action seeking judicial review of the final decision of Defendant Andrew Saul, Commissioner of Social Security (the "Commissioner") denying Gurzenda's application for supplemental security income under Title XVI of the Social Security Act. Gurzenda argues that an administrative law judge (the "ALJ") committed reversible error when she failed to address Gurzenda's psychosis within the listings, failed to fully develop the record, and failed to address non-exertional limitations. The parties have filed cross motions for summary judgment pursuant to Civil Local Rule 16-5. For the reasons stated below, Gurzenda's motion is GRANTED, the Commissioner's motion is DENIED, and the case is REMANDED for further administrative proceedings in accordance with this order.[1]

## II.    BACKGROUND

### A.    Procedural History

On July 6, 2016, Gurzenda applied for supplemental security income for her alleged disability beginning on May 26, 2016.[2] Administrative Record ("AR," dkt. 14) at 285. This is

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).
[2] The ALJ's decision states that Gurzenda applied for benefits on "July 31, 2016." AR at 15. This discrepancy is not material to the outcome of the present motions.

Gurzenda's third time applying for Supplemental Security Income. She applied previously on July 31, 2005 and on October 30, 2014; both of those applications were denied. The prior unfavorable decision for Gurzenda's 2014 application was on May 25, 2016, a day before the onset date for this current application.

Gurzenda's present application was initially denied on November 22, 2016, and denied upon reconsideration on January 23, 2017. *Id.* at 129, 146. Gurzenda filed a written request for a hearing before an ALJ on January 31, 2017. *Id.* at 183. A hearing was held on June 27, 2017, in San Jose, California. *Id.* at 30–64. Gurzenda was represented at the administrative hearing by Timothy Reed, an attorney, but Reed no longer represents her before this Court on appeal. *See id.* at 30; *see generally* Gurzenda's Mot. (dkt. 23). Impartial vocational expert Robert Raschke, M.Ed., ("VE Raschke") also appeared by telephone and testified at the hearing. AR 30. On September 20, 2017, the ALJ issued an unfavorable decision, finding that Gurzenda was not disabled under § 1614(a)(3)(A) of the Social Security Act. *See id.* at 15–24. Gurzenda requested review of the ALJ's decision, which the Social Security Administration Appeals Council denied on December 20, 2017, as it "found no reason under [its] rules to review the [ALJ's] decision." *Id.* at 1–3. Gurzenda filed a complaint on January 22, 2018, seeking judicial review by this Court. Compl. (dkt. 1) at 2. Pursuant to Civil Local Rule 16-5, Gurzenda filed a motion for summary judgment, and the Commissioner filed a cross-motion for summary judgment. *See* Gurzenda's Mot.; Comm'r's Mot. (dkt. 29).

## B. Gurzenda's Background

### 1. Personal History

Gurzenda is fifty-four years old. AR at 557. She was born and raised in Palo Alto, California, but now resides in San Jose, California. *Id.* at 479. Gurzenda is currently homeless. *Id.* at 371. She attended school until the twelfth grade and has a high school diploma. *Id.* at 325. Gurzenda spent three years in federal prison for "various offenses." *Id.* at 479. She is currently unemployed, and her main source of income is food stamps in the amount of $150 per month. *Id.* at 479. Gurzenda reports that she does not take care of anyone else. *Id.* at 372. She has never been married, and she has five children. *Id.* at 465. Gurzenda's youngest child is 17 years old and

2

currently lives in foster care. *Id.*

### 2. Medical History

Gurzenda's claim for disability is based primarily on her Morgellons Disease, which, according to her statement to a doctor, was diagnosed in 2011 at Santa Clara Valley Medical Clinic. *See id.* at 436. Morgellons Disease, or "Delusional Parasitosis," is a mental disorder that "causes [Gurzenda] to believe that there are bugs or other microscopic pathogens [under her skin] causing her very distressing physical symptoms." *Id.* at 453.[3] She believes the disease either started about seventeen years ago when her landlord "was putting black mold into her water supply," or that "she likely contracted [Morgellons] from a tick about [eighteen] years ago." *Id.* at 432, 464. Gurzenda reports in her application that she "really ha[s] something growing on [her] head [like] a parasite," which feels like "its going to [her] brain" and causes constant, severe pain in her head. *Id.* at 378.

Gurzenda has a history of substance abuse as well as other mental health issues. *See id.* at 70, 80–81. She admitted to previously using methamphetamine but states that she has been sober since 2014. *Id.* at 70. Gurzenda also spent time in prison for offenses relating to controlled substances. *Id.* While incarcerated, she began to experience psychiatric symptoms, such as depression and post-traumatic stress. *Id.* at 80–81, 464. These symptoms have gotten worse due to her Morgellons and the current stressors of being homeless and unemployed. *Id.* at 464.

#### a. Reza Kafi, M.D.

On September 29, 2015, Gurzenda went to see Reza Kafi, M.D., for a dermatology visit for her Morgellons. *Id.* at 514. Dr. Kafi reported that Gurzenda requested a biopsy of her scalp and said "[i]f [she doesn't] do the biopsy today, there will be problems." *Id.* Dr. Kafi further stated Gurzenda knows she has Morgellons, but she wants "a biopsy to see what is wrong in the area." *Id.* Gurzenda told Dr. Kafi "that [her] hair has [a] firm cord that wraps around [her] postauricular

---

[3] The nature of Morgellons Disease—and indeed its existence a distinct malady—is controversial, with some patients believing it to be a physical dermatological condition. Both parties' arguments in this case and all of the medical opinions in the record characterize Gurzenda's condition as at least primarily psychological; this order therefore uses the terms "Morgellons Disease" and "Delusional Parasitosis" interchangeably.

scalp and around [her] ear, causing [a] crease in [the] earlobe, and causing pain" and that she "feel[s] like [she's] dying from this." *Id.* Dr. Kafi concluded the results from the physical skin exam showed there were no "fibers" coming from Gurzenda's scalp. *Id.* at 516. Dr. Kafi stated Gurzenda "has a fixed delusion" and that "this is NOT A PRIMARY SKIN PATHOLOGY, [she] needs mental/behavioral health help with this issue." *Id.* at 517. However, before Dr. Kafi could provide her with a referral and paperwork, Gurzenda "abruptly left the clinic." *Id.* at 516.

b. Asian Americans for Community Involvement: Social Worker Visits

Asian Americans for Community Involvement, a non-profit organization that provides healthcare services, appears to be where Gurzenda's receives most of her medical care. Her psychiatrist and social workers are employed here. Their records also provide the strongest support for her disability claim.

In a letter sent to social services on August 12, 2016, Jenny Kim, MSW, wrote that Gurzenda "received rehabilitation therapy twice per month since May 13, 2016 with a former therapist, and has been scheduled with bi-weekly sessions with [a] counselor since August 12, 2016." *Id.* at 454. Jenny Kim sent a second letter to social services on September 2, 2016 which was co-signed by Kao Saechao, LCSW. *Id.* at 461. They again reiterated that Gurzenda "had received treatment" and that she was diagnosed with "[p]sychotic disorder with delusions due to known physical condition," "inadequate housing," and "problem related to social environment, unspecified." *Id.*

On April 5, 2017, Gurzenda had an appointment with Kyong Ohk Kim, ASW, and Mio Hidaka, LCSW, to talk about her goals moving forward to help her cope with her Morgellons. *Id.* at 540. They recorded "[f]or the next 6 months, [Gurzenda] will practice mindfulness meditation" and "attend individual therapy session[s] bi-weekly to regulate her symptoms" with the desire for Gurzenda to be "less anxious about [her] Morgellons disease and [to] enjoy[] daily activities." *Id.* Kyong Kim and Hidaka stated that Gurzenda "continues . . . having pains and symptom (e.g., depressive mood and anxiety, easily tired, and agitated, and pain in her ear and body, paranoid about her disease) which are a result of her diagnosis of Morgellons disease" and that her homelessness "makes [it] difficult to manage her symptoms." *Id.* They concluded that Gurzenda

4

"has strong interests [in] taking care of her pain and [is] very independent and resilient." *Id.*

      c.  <u>Leena Khanzode, M.D.</u>

Gurzenda has seen Leena Khanzode, M.D., who appears to be her primary doctor, several times since she applied for supplemental security income. First, on August 17, 2016, Gurzenda went to see Dr. Khanzode for a psychiatry assessment. *Id.* at 534. Dr. Khanzode reported Gruzenda told her she "feels a crawling and burning sensation in her head and that a dark growth matter is coming out of her head." *Id.* Gurzenda also told Dr. Khanzode that she feels "'something [is] moving around' on [the] back of her head, and [that] something is growing inside [her] ear, its [sic] long and keeps moving." *Id.* Gurzenda told Dr. Khanzode that she is "not crazy" and that the "doctors that she has gone to have not helped her." *Id.* Dr. Khanzode wrote that Gurzenda believes "her case has 'fallen through the cracks'" and that she is getting "worse and worse." *Id.* Dr. Khanzode recorded Gurzenda's symptoms as "feeling depressed because she has not been well, low energy, conc[entration] is poor, anhedonia, does not feel well to do activities, sleep is not so good, DFA, appetite is ok, no SI/HI." *Id.* She also wrote that Gurzenda is under increased stress as she has "no job" and "no place to live." *Id.* As Gurzenda reported running out of medication a month earlier, Dr. Khanzode prescribed Gurzenda Zyprexa and Prozac to take daily in hopes of relieving her pain and anxiety. *Id.* at 534, 536.

On October 5, 2016, Gurzenda went to see Dr. Khanzode for a follow-up appointment. *Id.* at 537. Once again, Dr. Khanzode reported Gurzenda "has been feeling depressed because she has not been well, low energy, conc[entration] is poor, anhedonia- does not feel well to do activities, sleep is not so good, DFA, appetite is ok, no SI/HI." *Id.* Dr. Khanzode also mentioned Gurzenda "stated she has bodyache, esp[ecially] her feet," that she "has been anxious recently," and that "wanted to leave early from this visit as she was in pain." *Id.* Dr. Khanzode reported Gurzenda had "stopped Zyprexa as it was too sedating," so she increased her Prozac prescription and restarted her on Zyprexa at a decreased dosage. *Id.* at 537–38.

On April 5, 2017, Gurzenda went to see Dr. Khanzode again for her "delusional parasitosis." *Id.* at 543. Dr. Khanzode reported Gurzenda "is less depressed, crying less, energy is low, angry, anhedonia, sleep is restless, appetite is too good, gaining weight, no SI/HI." *Id.* She

noted that Gurzenda "believes she has the M[orgellons] syndrome and now wants a biopsy." *Id.*

Dr. Khanzode found "no significant change" in her mood, thought process, motor activity,

behavior, or medical condition since her last visit. *Id.* Dr. Khanzode "encouraged [Gurzenda] to

exercise and eat healthy," told her to continue Prozac, and increased her Zyprexa prescription back

to its original strength. *Id.* at 544.

On June 15, 2017, Dr. Khanzode reported Gurzenda was "depressed, irritable, crying

easily, energy is low, angry, anhedonia, sleep is restless, appetite is too good, gaining weight, no

SI/HI." *Id.* at 557. Dr. Khanzode wrote there was a "notable change" in Gurzenda's mood from

her last visit and she seemed more depressed. *Id.* at 558. Dr. Khanzode believed this change was

a result of Gurzenda feeling "overwhelmed after she lost her client who she was living with." *Id.*

However, Dr. Khonzode noticed "no significant change" in her thought process or behavior. *Id.*

She increased Gurzenda's Prozac dosage and told her to continue with Zyprexa. *Id.*

On March 1, 2017, Dr. Khanzode sent a letter to the Social Security office. *Id.* at 554. She

wrote that "Gurzenda suffers from a Psychotic Disorder and is being treated with medications for

the same." *Id.* Dr. Khanzode continued that "[d]ue to her psychiatric illness she may not [be] able

to work fulltime and her prognosis is guarded." *Id.*

### d. Ralph H. Wood, M.D.

On October 5, 2016, Ralph H. Wood, M.D., performed an internal medicine evaluation.

*Id.* at 473. This was a consultative examination arranged by the Department of Social Services.

*Id.* at 472. Dr. Wood reported that Gurzenda's chief complaints at this exam were her depression

and Morgellons. *Id.* at 473. She told to Dr. Wood that she had "been depressed for many years."

*Id.* Dr. Wood also reported that Gurzenda said she has been seeing "a psychiatrist for at least five

years" and that "[c]urrently she sees her psychiatrist once a month and a therapist every two

weeks." *Id.* In terms of physical pain, Dr. Wood wrote "she complains of numbness and tingling

and itching in her head particularly in the posterior aspect"; however, "[w]hen [Dr. Wood] looked

at the scalp it appeared normal to [him]." *Id.* Dr. Wood concluded that Gurzenda's head pain is

"probably related to her mental problems and depression" and not a physical impairment. *Id.*

Dr. Wood also completed a physical examination of Gurzenda and discovered no major

issues. *Id.* at 474. In Dr. Wood's functional capacity assessment, he determined Gurzenda "can stand and/or walk for six hours out of an eight-hour shift" and that he found "no limitations on sitting." *Id.* at 475. Dr. Wood also found that Gurzenda "can regularly lift, push, or pull up to 20 pounds and occasionally 30 pounds" and that she had "no hand movement or fine finger limitations." *Id.* If she had any limitations, Dr. Wood believed they would be on a "psychiatric basis." *Id.* Dr. Wood's impression of Gurzenda from the visit was that she may have "[c]hronic psychosis with itching in scalp" and "[p]ossible Morgellons syndrome." *Id.*

e. Jeremy Blank, Psy.D.

On October 11, 2016, Gurzenda visited Jeremy Blank, Psy.D., for a psychological evaluation. *Id.* at 478. This was another consultative exam arranged by the Department of Social Services. *Id.* at 477. Dr. Blank reported that Gurzenda stated she "had Morgellan's [sic] disease for 17 years" and that she was "diagnosed with bipolar disorder about 10 years ago, and . . . developed PTSD from experiences while in prison several years back." *Id.* at 478. He reported that Gurzenda is "currently being treated by a psychiatrist and a mental health therapist" and that she is currently taking medications and responding "positive[ly]" to them. *Id.* at 479. As Dr. Blank had "no medical records available for review," he had to rely on Gurzenda's testimony of her medical history. *Id.* at 478. Dr. Blank said her current symptoms included "poor sleep, frequent worry and anxiety, and depression" and that her current homelessness "adds to her level of stress and worry." *Id.*

As part of the appointment, Dr. Blank conducted a mental status examination. *Id.* at 479. He reported that Gurzenda appeared "well groomed with good hygiene," was "cooperative," her motor activity was "intact," she had "good" eye contact, "coherent" speech, and seemed "alert." *Id.* Dr. Blank also stated that Gurzenda scored a "25 out of 30" on a "mini mental status exam," which tests things such as "arithmetic, memory and orientation" and is normally used "to screen for dementia." *Id.* at 480. This score fell within the "normal" limits and Dr. Blank reported "[s]he had no difficulty following simple or complex directions" and that her concentration and attention was "unimpaired." *Id.* at 479–80. Dr. Blank also found that Gurzenda's judgment and insight received "fair" marks, and her thought process was "intact" and "linear and logical." *Id.* at 480.

However, he noted Gurzenda was "impaired" with calculations as she was "unable to complete all serial 7's," and that her memory was also "mildly impaired" as she "recalled 3 out of 3 items immediately and 2 of 3 words after a brief delay with inference." *Id.* at 479–80. Dr. Blank also found that her mood was "hypomanic" and there was "some suggestion of delusion material." *Id.* at 480. He determined she was emotionally "[m]oderately to severely impaired due to a variety of mental health struggles" and was also "[m]oderately to severely impaired" functionally. *Id.* at 481. Dr. Blank's diagnostic impressions were that Gurzenda had "[b]ipolar I disorder, most recent episode manic, moderate" and he assessed "rule out" diagnoses[4] of "[p]ost traumatic stress disorder" and "unspecified schizophrenia spectrum and other psychotic disorder." *Id.*

Since this examination was requested by the Department of Social Security, Dr. Blank also completed a "work related abilities and impairments chart" where he listed what he believed Gurzenda's level of impairment would be with respect to various work-related skills. *Id.* Dr. Blank's responses were as follows: (1) Gurzenda's ability to follow simple instructions was "unimpaired"; (2) her ability to follow complex or detailed instructions was "mildly impaired"; (3) her ability to maintain adequate pace or persistence to perform one or two step simple repetitive tasks was "unimpaired" and for complex tasks was "mildly impaired"; (4) her ability to maintain adequate attention and concentration was "moderately impaired"; (5) her ability to adapt to changes in job routine was "moderately impaired"; (6) her ability to withstand the stress of a routine workday was "mod[erately]-sev[erely] impaired"; (7) her ability to interact appropriately with co-workers, supervisors, and the public on a regular basis was "mod[erately]-sev[erely] impaired"; and (8) her ability to adapt to changes, hazards, or stressor in a workplace setting was "mod[erately]-sev[erely] impaired." *Id.*

---

[4] "A 'rule-out' diagnosis means there is evidence that the criteria for a diagnosis may be met, but more information is needed in order to rule it out." *Carrasco v. Astrue*, No. ED CV 10-0043 (JCG), 2011 WL 499346, at *4 (C.D. Cal. Feb. 8, 2011) (emphasis in original, citations omitted); *see also Garner v. Comm'r of Soc. Sec.*, No. 2:17-CV-00232 (LRS), 2018 WL 2224061, at *3 (E.D. Wash. May 15, 2018) ("A 'R/O' (Rule Out) diagnosis means there is uncertainty about the diagnosis and although there is evidence that the criteria for the diagnosis may be met, more information is needed to rule it out.").

f.  Veena Gowra, M.D.

On December 15, 2016, Gurzenda went to see Veena Gowra, M.D., for "ear pain and [for] Morgellons disease." *Id.* at 517.  Dr. Gowra reported that Gurzenda was "alert and oriented, no apparent distress" and had a "slightly scaly rash of the lobule, other wise . . . normal." *Id.* at 518. She ran a few tests, and nothing came back physically abnormal regarding her Morgellons. *See id.* at 519–26.  Dr. Gowra mentioned that Gurzenda again "request[ed] a referral to Dermatology for a biopsy of her scalp" due to the pain in her head from Morgellons. *Id.* at 517.  Dr. Gowra granted that request and gave her ointment for her ear. *See id.* at 518–19.

On June 20, 2017, Gurzenda saw Dr. Gowra for "pain" from hypertension and stress. *Id.* at 562–63.  The medical record from the visit is rather short, but it appears Dr. Gowra may have prescribed her additional medication to help with the increased pain. *Id.*  That same day Dr. Gowra also wrote a letter to the Social Security office. *Id.* at 561.  It contained two sentences and stated that Dr. Gowra was "certify[ing] that Gurzenda, Angelina is eligible for permanent disability" and to contact her if there are "any other questions." *Id.*  Dr. Gowra also filled out a "general assistance program" form for Gurzenda as well, identifying Morgellons as the reason for Gurzenda's disability. *Id.* at 560.  Dr. Gowra checked boxes saying there would be a "significant restriction of activities of daily living" and "significant deficiencies of concentration, persistence or pace" because of Gurzenda's Morgellons. *Id.*  She also checked that Gurzenda is "incapable of low stress jobs," that she feels Gurzenda is "permanently disabled/ unable to work," and that she supports Gurzenda pursuing a disability claim. *Id.*  Dr. Gowra wrote that the "objective evidence" of Gurzenda's limitations was from a "physical evaluation" she had done of Gurzenda. *Id.*

g.  S. Khan, M.D.

S. Khan, M.D., a state agency consultant, reviewed Gurzenda's medical records in November 2016 and found that she suffered from the following medically determinable impairments: affective disorders (primary, non-severe); schizophrenic, paranoid and other functional psychotic disorders (secondary, non-severe); fibromyalgia (other, non-severe); and dermatitis (other, non-severe). *Id.* at 139.  Dr. Khan considered Listing 12.03 (schizophrenic, paranoid and other functional psychotic disorders) and 12.04 (affective disorders) and found none

of Gurzenda's medically determinable impairments satisfied the "paragraph A" criteria for either

Listing. *Id.* at 140. Dr. Khan also evaluated whether any of Gurzenda's impairments satisfied the

"paragraph B" criteria for the same Listings and determined that they did not. *Id.* Dr. Khan found

that Gurzenda had a "mild" restriction of activities of daily living, "moderate" difficulties in

maintaining social functioning, "moderate" difficulties in maintaining concentration, persistence,

or pace, and no episodes of decompensation of extended duration. *Id.* Dr. Khan also concluded

that Gurzenda's impairments did not meet the "paragraph C" criteria for Listings 12.03 and 12.04.

*Id.* Dr. Khan attributed "great weight" to the results from Dr. Blank's mental evaluation. *Id.* at

142.

Dr. Khan then completed a residual functional capacity assessment and found that

Gurzenda had moderate limitations concerning her ability to "understand and remember detailed

instructions," her ability to "carry out detailed instructions," her ability to "maintain attention and

concentration for extended periods," her ability to "perform activities within a schedule, maintain

regular attendance, and be punctual within customary tolerances," her ability to "work in

coordination with or in proximity to others without being distracted by them," and her ability to

"complete a normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods." *Id.* at 142–43. Furthermore, in terms of social interactions and adaptations, Dr. Khan

found moderate limitations in her ability to "interact appropriately with the general public," her

ability to "accept instructions and respond appropriately to criticism from supervisors," her ability

to "get along with coworkers or peers without districting them or exhibiting behavioral extremes,"

her ability to "maintain socially appropriate behavior and to adhere to basic standards of neatness

and cleanliness," her ability to "respond appropriately to changes in the work setting," her ability

to "be aware of normal hazards and take appropriate precautions," and her ability to "set realistic

goals or make plans independently of others." *Id.* at 143–44. Dr. Khan concluded that Gurzenda

has the "ability to do simple unskilled work with limited public contact" and that she was not

disabled.[5]  *Id.* at 139.

h.  <u>Alan Berkowitz, M.D.</u>

Alan Berkowitz, M.D., a state agency consultant, completed a reconsideration analysis in January 2017.  *Id.* at 121.  He reviewed Gurzenda's medical history and found that she suffered from: affective disorders (primary, non-severe); schizophrenic, paranoid and other functional psychotic disorders (secondary, non-severe); fibromyalgia (other, non-severe); dermatitis (other, non-severe); essential hypertension (other, non-severe); and trauma and stressor related disorders (other, severe).  *Id.* at 122.  Dr. Berkowitz considered the same listings that Dr. Khan considered, Listings 12.03 and 12.04, along with Listing 12.15 (trauma and stressor related disorders).  *Id.* at 123.  Dr. Berkowitz reached the same conclusion that Gurzenda's impairments do not satisfy the "paragraph A," "paragraph B," or "paragraph C" criteria for any of those listings.  *Id.*  Like Dr. Khan, he attributed "great weight" to the results from Dr. Blank's mental evaluation and found that Gurzenda suffered from the same moderate limitations as discussed above.  *Id.* at 124–27.  Dr. Berkowitz found that Gurzenda's impairments "do not prevent [her] from performing work [she has] done in the past as a/an caregiver" and that her "condition is not severe enough to keep [her] from working."[6]  *Id.* at 129.

### 3.  Administrative Hearing on June 27, 2017

The ALJ began her examination of Gurzenda with questions concerning Gurzenda's employment history.  *Id.* at 37–44.  Gurzenda stated she had worked for K-Mart for "a couple months" in 2005 "unloading the truck and stocking shelves."  *Id.* at 37–38.  She then worked at Lucky Stores in 2005 and 2006 as a courtesy bagger for "seven months" and as a checker for "two months."  *Id.* at 38–39.  During her time as a checker, Gurzenda "ha[d] difficulty with the computers" and "couldn't do the codes for produce and stuff," so her employment was cut short.  *Id.* at 39.  Next, Gurzenda worked for Dollar Tree in 2006 "unloading the truck" for a period of

---

[5] L.C. Chiang, M.D., also wrote a brief section in Dr. Khan's analysis.  Dr. Chiang performed a "medical evaluation" of Gurzenda's records and determined her physical impairments to be "non-severe."  AR 139.

[6] M. Ormsby, M.D., also wrote a brief section in Dr. Berkowitz's analysis.  Dr. Ormsby performed a "medical evaluation" of Gurzenda's records and determined her physical impairments to be "non-severe."  AR 122.

"maybe two months." *Id.* at 39–40. These jobs were all part-time and required her to do some light lifting, between twenty and fifty pounds, by herself. *See id.* at 37–40. Gurzenda then spent time in prison. After Gurzenda's incarceration, she "helped clean the laundromat" for "a couple of months." *Id.* at 41. This job was particularly stressful for her as the owner was "[s]creaming at [her] all the time." *Id.* at 42. Although Gurzenda did receive some monetary payment, the main reason she cleaned the laundromat was so that she would have a place to wash up and stay for the night. *Id.* at 42. The ALJ asked Gurzenda whether she was currently employed, and Gurzenda testified that she was working part-time as a caregiver after filing her application, but that had ended before this hearing. *Id.* at 43. She received no monetary payment, and instead could "stay there like two nights a week" in return for her services. *Id.* Gurzenda's 17-year-old son, who is currently in foster care, was also allowed to stay with her on those nights. *Id.*

Then, the ALJ asked Gurzenda about her daily activities. *Id.* at 44. Gurzenda testified that she is currently staying in "a conversion van . . . a couple nights a week" with one of her friends. *Id.* Since her friend takes his van to work during the day, Gurzenda spends "most days" at Columbus Park. *Id.* at 46. She "go[es] there all the time" and "sit[s] at the park a lot." *Id.* Gurzenda also spends her time "try[ing] to take care of [her] appointments," which she gets to through ride services set up by her doctors since her hips and feet "bother [her] a lot." *Id.* at 44–46. She also looks forward to spending time with her son. *Id.* at 47.

The ALJ asked Gurzenda why she has not been able to work, and Gurzenda testified that she has trouble focusing. *Id.* at 47. Gurzenda explained that her "Morgellons disease has gotten extremely worse" and her "head bothers [her] real bad all the time and [her] ear, and [she] feel[s] a lot of confusion." *Id.* She further stated that "[i]t's just gotten progressively worse and all the mental health medications don't seem to do nothing." *Id.* Gurzenda testified saying she feels like she has "do[ne] nothing with [her] life," as she has not been able to raise her son, hold a job, or have a home for "all these years" because her Morgellons has been so extreme. *Id.* at 48.

Gurzenda's attorney, Timothy Reed, began his examination of Gurzenda by asking Gurzenda what other mental health conditions she was currently experiencing. *Id.* at 49. Gurzenda testified that she was "diagnosed with anxiety and depression, and traumatic stress

12

disorder, and fibromyalgia." *Id.* Her anxiety, depression, and PTSD cause her to "have trouble sleeping at night" and as a result she gets "maybe four" hours of sleep a night, making her "feel tired all-day long." *Id.* at 50. The fibromyalgia causes aching throughout "all [her] joints all over [her] body" and Gurzenda feels like she has "a headache that never goes away." *Id.* Reed also asked how much weight Gurzenda believed she could "lift and carry" using the example of milk gallons, to which she replied that she could pick up one full gallon and "maybe" two full gallons. *Id.* at 51. Besides lifting, Gurzenda also has problems walking because her feet "[r]eally hurt all the time." *Id.* Gurzenda testified that it takes her "[a]t least 10 minutes" to walk one block and that she can only stand for "less than 10 minutes" as her "legs go numb a lot." *Id.* at 50–51.

The ALJ then began her examination of a vocational expert, VE Raschke, by asking him a series of hypotheticals surrounding "a hypothetical individual who has the same vocational profile as [Gurzenda's] as far as age, education, and prior work experience." *Id.* at 56. The ALJ first asked if "an individual who was limited to simple, repetitive task characteristic of unskilled work that required only routine contact with co-workers and the public" would be able to "perform any of [Gurzenda's] prior work." *Id.* VE Raschke testified that "the only two jobs that would continue to exist would be the job as a bagger . . . or a laundry worker." *Id.* The ALJ then asked what jobs would be available if "contact with the co-workers and the public could be occasional" was added to the hypothetical. *Id.* at 57. VE Raschke answered that none of Gurzenda's prior jobs would fit this profile as the employee is "exposed to the public on a frequent basis," but identified other jobs currently available in the economy that would fit this description, such as "candy makers" and "hand packers." *Id.* at 57–59. Both jobs are "entry level" with "medium exertion" and the number of jobs in the US are "in excess of 98,000" and "172,000" respectively. *Id.*

Reed then asked whether the numbers given for available jobs in the economy were in terms of full-time employment. *Id.* at 59. VE Raschke responded that "90 percent of them are full-time jobs." *Id.* at 60. Reed closed the hearing by asking the ALJ to carefully consider the value of Gurzenda's past work experience. *Id.* at 61. He argued that because the payment for her most recent jobs was in terms of room and board instead of money, they should not be considered

13

substantial gainful activity. *Id.*

### 4. Administrative Hearing on March 9, 2016 and Unfavorable Decision by the Previous ALJ on May 25, 2016 for Gurzenda's 2014 Application

Gurzenda's record also includes the transcript of the hearing from her previous 2014 application for Supplemental Security Income and the prior ALJ's unfavorable decision. *See generally id.* at 65–109. In the current application, Gurzenda sets an onset date of May 26, 2016, which is a day after her 2014 application's unfavorable decision. Due to the narrow time frame, there is a large overlap in information provided at both the 2016 and 2017 hearings. In both hearings, Gurzenda argued she was disabled by the same illnesses, primarily focusing on Morgellons disease. *See id.* at 47, 76. She also provides the same narrative of her daily activities, where she spends her nights in a van with her friend and then goes to the park during the day. *See id.* at 44, 46, 73, 88. Gurzenda reiterates the same employment history, except for testifying to new caregiver jobs. In the 2016 hearing, she stated she "worked for like a caregiver" from 2005 to 2008 in exchange for room and board and that she currently was "do[ing] a little bit of housework" for an "older gentleman that [she] know[s]." *Id.* at 71–72. These caregiver jobs were not discussed in the most recent 2017 hearing, but as previously mentioned above, Gurzenda testified that she was working as a caregiver once again after she filed her 2016 application. *See id.* at 43. In general, the testimony at the two hearings was similar, and the parties do not refer to the 2016 hearing in their arguments other than to provide more background information about Gurzenda's condition.

Like the current ALJ, the prior ALJ also found that Gurzenda "has not been under a disability, as defined in the Social Security Act" and denied her 2014 application for Supplemental Security Income. *Id.* at 109. The current ALJ references this decision to show that normally since Gurzenda has not proven "changed circumstances" between the unfavorable decision on May 25, 2016 and her decision on September 20, 2017 that would be "sufficient to rebut the determination of not disabled arising from the date of the prior, and rather recent, unfavorable decision," there

would be a presumption of continuing non-disability.[7]  *Id.* at 15 (citing *Chavez v.* Bowen, 844 F.2d 691 (9th Cir. 1988)).  However, since there had been a change in the listing of mental impairments, *Chavez* did not preclude Gurzenda's July 2016 application from being considered by the current ALJ.  *Id.*  The Commissioner also references this May 25, 2016 decision in his motion, stating Gurzenda could not question the prior ALJ's conclusion in analyzing her record since she did not appeal that administrative decision.  *See* Comm'r's Mot. at 11.  Thus, the "failure to appeal the administrative denial of her prior application made that decision administratively final."  *Id.* (citing 20 C.F.R. §§ 416.1487, 416.1488).

## C.    Legal Background for Determination of Disability

### 1.    Five-Step Analysis

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also id.* § 432(a)(1). A claimant is only found disabled if the claimant's physical or mental impairments are of such severity that the claimant is not only unable to do previous work but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a "five-step sequential evaluation process" to determine if a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  "The claimant bears the burden of proving steps one through four, consistent with the general rule that '[a]t all times, the burden is on the claimant to establish . . . entitlement to disability insurance benefits.'"  *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007) (quoting *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998)).  At Step One, the ALJ must determine if the claimant is engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(I).  If so, the ALJ determines that the claimant is not disabled and the

---

[7] Gurzenda stated in her application she has "no" new physical or mental conditions since her prior application.  The "change" in circumstance she argues is that her "ability to concentrate has gotten worse" and that "[s]he feels disoriented, weak, and confused, and is in constant pain."  AR at 116.

1    evaluation process stops.  If the claimant is not engaged in substantial gainful activity, then the

2    ALJ proceeds to Step Two.

3         At Step Two, the ALJ must determine if the claimant has a "severe" medically

4    determinable impairment.  An impairment is "severe" when it "significantly limits [a person's]

5    physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).  If the claimant

6    does not have a "severe" impairment, then the ALJ will find that the claimant is not disabled.  If

7    the claimant does have a severe impairment, the ALJ proceeds to Step Three.

8         At Step Three, the ALJ compares the claimant's impairment with a listing of severe

9    impairments (the "listing").  *See* 20 C.F.R. Pt. 404, Subpt. 1, App. 1.  If the claimant's impairment

10   is included in the listing, then the claimant is disabled.  The ALJ will also find a claimant disabled

11   if the claimant's impairment or combination of impairments equals the severity of a listed

12   impairment.  If a claimant's impairment does not equal a listed impairment, then the ALJ proceeds

13   to Step Four.

14        At Step Four, the ALJ must assess the claimant's Residual Function Capacity ("RFC").

15   An RFC is "the most [a claimant] can still do despite [that claimant's] limitations . . . based on all

16   the relevant evidence in [that claimant's] case record." 20 C.F.R. § 404.1545(a)(1).  The ALJ then

17   determines whether, given the claimant's RFC, the claimant would be able to perform past

18   relevant work.  20 C.F.R. § 404.1520(a)(4).  Past relevant work is "work that [a claimant] has

19   done within the past fifteen years, that was substantial gainful activity, and that lasted long enough

20   for [the claimant] to learn how to do it." 20 C.F.R. § 404.1560(b)(1).  If the claimant is able to

21   perform past relevant work, then the ALJ finds that the claimant is not disabled.  If the claimant is

22   unable to perform past relevant work, then the ALJ proceeds to Step Five.

23        At Step Five, the burden shifts from the claimant to the Commissioner.  *Bray v. Comm'r of*

24   *Soc. Sec. Admin.*, 554 F.3d 1219, 1223 (9th Cir. 2009).  The Commissioner has the burden to

25   "identify specific jobs existing in substantial numbers in the national economy that the claimant

26   can perform despite his identified limitations." *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir.

27   1999) (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the Commissioner is

28   able to identify such work, then the claimant is not disabled.  If the Commissioner is unable to do

16

so, then the claimant is disabled.  20 C.F.R. § 404.1520(g)(1).

### 2. Supplemental Regulations for Determining Mental Disability

The Social Security Administration has supplemented the five-step general disability evaluation process with regulations governing the evaluation of mental impairments at steps two and three of the five-step process.  *See generally* 20 C.F.R. § 404.1520a;[8] *see also Clayton v. Astrue*, No. CIV 09-2282-EFB, 2011 WL 997144, at *3 (E.D. Cal. Mar. 17, 2011) (citing *Maier v. Comm'r of Soc. Sec. Admin.*, 154 F.3d 913 (9th Cir. 1998)).  First, the Commissioner must determine whether the claimant has a medically determinable mental impairment.  20 C.F.R. § 404.1520a(b)(1).  Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment with respect to four broad functional areas: (1) ability to understand, remember, or apply information; (2) ability to interact with others; (3) ability to concentrate, persist, or maintain pace; and (4) ability to adapt or manage oneself.  20 C.F.R. § 404.1520a(b)(2), (c).  Finally, the Commissioner must determine the severity of the claimant's mental impairment and whether that severity meets or equals the severity of a mental impairment listed in Appendix 1.  20 C.F.R. § 404.1520a(d).  If the Commissioner determines that the severity of the claimant's mental impairment meets or equals the severity of a listed mental impairment, the claimant is disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the evaluation proceeds to step four of the general disability inquiry.  *See* 20 C.F.R. § 404.1520a(d)(3).

Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the presence of various listed mental impairments, but all listed mental impairments share certain "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity criteria).  *See generally* 20 C.F.R. Pt. 404, Subpt. P, App. 1 at 12.00.  Therefore, any medically determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more listed mental impairments—is sufficiently severe to render a claimant disabled if it satisfies the

---

[8] The Commissioner's cross-motion addresses the amendments to the regulations and listings pertaining to mental impairments that became effective as of January 17, 2017.  *See* Comm'r's Mot. at 7 n.4.  Since the ALJ's decision was issued after the effective date, the new listings were applied.  Gurzenda does not dispute this application.  *See generally* Reply.

general Paragraph B criteria. To satisfy the Paragraph B criteria, one's mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. *See id*. A "marked" limitation is one that is "more than moderate but less than extreme" and "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id*. at 12.00C.

This evaluation process is to be used at the second and third steps of the sequential evaluation discussed above. Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."). If the Commissioner determines that the claimant has one or more severe mental impairments that neither meet nor are equal to any listing, the Commissioner must assess the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3). This is a "mental RFC assessment [that is] used at steps 4 and 5 of the sequential process [and] requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments . . . ." Social Security Ruling 96-8p, 1996 WL 374184, at *4.

**D.    The ALJ's Decision**

**1.    Step One: Substantial Gainful Activity**

At Step One, the ALJ found that Gurzenda "has not engaged in substantial gainful activity since July 31, 2016, the application date." AR at 18. She stated the record showed Gurzenda "worked after the application date but this work activity did not rise to the level of substantial gainful activity." *See id*. The ALJ mentioned that her part-time job as a caregiver could be considered substantial gainful activity because Gurzenda received room and board in exchange for her employment and the value of that compared to "rentals in this expensive area" could be considered substantial. *Id*. However, the ALJ concluded "the existing record on this issue is

18

United States District Court
Northern District of California

insufficient" and that she would use her employment as a caregiver only in the context of analyzing Gurzenda's residual functional capacity. *Id.*

### 3. Step Two: Severe Impairments

At Step Two, the ALJ determined that Gurzenda "has the following severe impairments: affective (mood) disorder; and psychotic disorder with history of Morgellon's Disease." *Id.* She stated Gurzenda "has a medical history significant for Morgellon's Disease, described as feeling a sensation of black fibers crawling underneath the skin," which has created severe limitations on her ability to function normally. *Id.* However, the ALJ found that "the record does not include any clinical signs or laboratory findings to support a diagnostic impression of fibromyalgia" and that PTSD "is similarly undocumented with clinical observation and treatment notes." *Id.* The ALJ also refused to consider Gurzenda's other "non-severe" impairments listed in the record as part of her disability, including her "non-durational treatment for diarrhea, vitamin D deficiency, her well-controlled blood pressure issues associated with hypertension without end organ damage, and her ear infections that persisted for less than 12 continuous months of significant ongoing limitation." *Id.*

### 4. Step Three: Medical Severity

At Step Three, the ALJ found that Gurzenda "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." *Id.* at 20. In making this determination, the ALJ "considered whether the 'paragraph B' criteria [were] satisfied" for listings "12.04 or 12.03." *Id.* The ALJ noted that, to satisfy the "paragraph B" criteria, Gurzenda's "mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning, which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing [herself]." *Id.*

First, the ALJ found that "[i]n understanding, remembering, or applying information, [Gurzenda] has mild limitations." *Id.* She notes that "only 'mild' memory limitation was assessed by the consultative psychologist" and that Gurzenda "is able to negotiate public transportation, as well as shop in stores, do her own laundry, pay bills, and handle bank accounts." *Id.* Next, the

ALJ stated that Gurzenda has "moderate limitations" in interacting with others as she is outside "always" spending most of her days at Columbus Park, she is able to shop in stores, and she was "observed able to interact appropriately" during her consultative psychological evaluation. *Id.* The ALJ also found that in "concentrating, persisting, or maintaining pace, [Gurzenda] has moderate limitations." *Id.* at 21. Again, the ALJ referred to the fact that Gurzenda can "take public transportation, shop in public, pay bills, and handle bank accounts." *Id.* The ALJ noted that "[t]he consultative psychologist observed [Gurzenda's] concentration during [her] mental status evaluation to be 'unimpaired,' and described her though processes as intact, linear, and logical," and that Gurzenda reported she ccould perform hobbies such as bead work and painting "very well." *Id.* The ALJ stated Gurzenda has "mild limitations" in terms of adapting or managing herself. *Id.* The ALJ also noted that "[t]he record does not really document any significant decompensation or worsening of symptoms since the date of the unfavorable decision" and that Gurzenda "reports working part-time as an in-home caregiver." *Id.* Taking this all into consideration, the ALJ concluded that Gurzenda's "mental impairments do not cause at least two 'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria are not satisfied." *Id.*

The ALJ then considered whether the "paragraph C" criteria were satisfied and concluded that "the evidence fails to establish the presence of the 'paragraph C' criteria." *Id.* The ALJ did not provide any further explanation as to why she thought the "paragraph C" criteria were not met. *Id.*

### 5. Step Four: Residual Functional Capacity

At Step Four, the ALJ determined that Gurzenda "has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant can perform simple repetitive tasks characteristic of unskilled work, involving only routine contact with co-workers and the public." *Id.* In support of this determination, the ALJ noted that she "ha[d] considered all symptoms and the extent to which these symptoms reasonably can be accepted as consistent with the objective medical evidence and other evidence." *Id.* at 22. She further noted that she "ha[d] also considered opinion evidence." *Id.*

The ALJ gave "significant reliance to the assessments by the DDS evaluators, [and] some but less reliance to the consultative physician and clinician." *Id.* at 21. The ALJ then explained why she relied less on the non-state agency consultants. *Id.* First, she stated that the consultative physician, Dr. Wood, failed to support his findings with medical evidence. *See id.* at 22. As such, the ALJ rejected his conclusion that Gurzenda had "physical limitations such as lifting weights [due] to her psychiatric condition" since he is an "internal medicine specialist . . . [and] has not demonstrated psychiatric or psychological specialist credentials." *Id.* The ALJ also concluded that the "moderate to severe mental limitations" assessed by the consultative psychologist, Dr. Blank,[9] were "internally inconsistent" with the results from Gurzenda's mental evaluation. *Id.* Although the ALJ relied on the mental evaluation itself, she did not give Dr. Blank's conclusions regarding Gurzenda's limitations much weight. *Id.*

Additionally, the ALJ questioned the reliability of the findings by Dr. Khanzode, stating Gurzenda "may not been [sic] able to work full-time," and by Dr. Gowra, stating Gurzenda was "incapable of low stress jobs" and "permanently disabled/unable to work." *See id.* at 19–22. The ALJ reasoned that the neither Dr. Khanzode nor Dr. Gowra gave an "exact function by function analysis . . . or any medical foundation or dates of laboratory or treatment note findings to serve as medical foundation for the conclusions of 'permanent' disability or 'incapable of low stress work,' and so forth, nor [was] any 12 continuous month period cited." *Id.* at 22. The ALJ found these statements were "markedly noncompliant with the requirements of disability as directed by the Social Security Act." *Id.* Since the ALJ concluded Dr. Khanzode's and Dr. Gowra's findings were not backed by medical evidence, they were not heavily weighted in her decision. *See id.*

In evaluating Gurzenda's credibility, the ALJ found that while Gurzenda's "medically determinable impairments could reasonably be expected to cause the type of alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id.* at 23. In addition to Morgellons Disease, Gurzenda testified to

---

[9] The ALJ refers to Dr. Blank as "Dr. Black" throughout her decision.

having PTSD, depression, and full-body joint pain. *Id.* Gurzenda stated these issues cause her to feel "tired all day long" as she only gets four hours of sleep a night from the pain, and that she is unable to stand or walk for a period of longer than ten minutes before "her legs get numb." *Id.* The ALJ found that the record did not support Gurzenda's testimony and subjective allegations. *Id.* Instead, the ALJ noted that Gurzenda's activities of daily living supported the residual functional capacity that the ALJ assessed. *Id.* She observed that during Gurzenda's alleged period of disability, she worked part-time as a caregiver and was able to carry out many functions independently, such as taking public transportation, doing her own laundry, and shopping in public. *See id.* at 21, 23. The ALJ also mentioned Gurzenda "denie[d] using a wheelchair, walker or even a cane . . . and [that] there is no medical records of motor loss or abnormal gait." *Id.*

### 6. Step Five: Ability to Perform Other Jobs in the National Economy

The ALJ found that, "[c]onsidering [Gurzenda's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Gurzenda] also can perform." *Id.* at 23. The ALJ supported this finding by noting that Gurzenda's "ability to perform work at all exertional levels has been compromised by non-exertional limitations," however, she would still "be able to perform the requirements of such representative 'unskilled' . . . occupations such as: production worker . . . and sorter/operator." *Id.* at 24. Accordingly, the ALJ determined that a "finding of 'not disabled' is therefore appropriate under the framework of section 204.00 in the Medical-Vocational Guidelines." *Id.* The ALJ concluded that Gurzenda "is not disabled under section 1614(a)(3)(A) of the Social Security Act." *Id.*

### E. Motions for Summary Judgment

#### 1. Gurzenda's Motion for Summary Judgment

Gurzenda filed this action seeking review of the ALJ's decision and now moves for summary judgment on the basis that the ALJ committed three errors in her September 2017 decision. First, Gurzenda alleges that the ALJ erred at Step Three because she "failed to address Gurzenda's psychosis using the adult listing 12.00." Gurzenda's Mot. at 8. Gurzenda states the ALJ's finding of "adequate daily living skills, social skills and ability to focus and concentrate is

not supported by the record" under "paragraph B" and that "without an explanation the ALJ did not address [paragraph] 'C.'" *Id.* at 9–10. Second, Gurzenda argues that "[t]he ALJ failed to acknowledge or address the record from 2005 to 2015 and therefore did not develop the record." *Id.* at 10. Gurzenda states that if the ALJ had addressed the complete record, the ALJ would have seen she has been treated continuously for her mental impairment and has been "see[ing] her Psychiatrist once a month and her therapist every two weeks." *Id.* at 10–11. Third, Gurzenda argues that the ALJ erred in "fail[ing] to address non-exertional limitations at Step Five," such as "[w]hether Gurzenda is able to stay on task given her delusions." *Id.* at 11. Gurzenda reiterates these arguments in her reply brief. *See generally* Reply (dkt. 30).[10]

Gurzenda asks "the case to be credited as true or remanded for further development of the record." *Id.* at 7; *see also* Gurzenda's Mot. at 12.

## 2. The Commissioner's Motion for Summary Judgment

The Commissioner filed a cross-motion for summary judgment, asking the Court to affirm the ALJ's decision that Gurzenda is not disabled. Comm'r's Mot. at 1. First, the Commissioner contends that the ALJ properly analyzed the listings. *Id.* at 8. He states the ALJ properly found Gurzenda did not meet "paragraph B" since she "scored 25 out of a 30 possible points" and expressed "appropriate interaction, coherent speech, normal intelligence, unimpaired concentration, intact, linear, and logical thought processes, and unimpaired ability to follow simple or complex instructions" on a mental status evaluation administered by Dr. Blank.[11] *Id.* The Commissioner contends even though Dr. Blank opined that Gurzenda had "moderate to severe functional and emotional impairments," this finding was inconsistent with the results from his mental status evaluation and was properly rejected by the ALJ. *Id.* (citing *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223 (9th Cir. 2015)). The Commissioner also argues the ALJ correctly discounted the opinions of Dr. Khanzode and Dr. Gowra as Dr. Khanzode's opinion showed "no

---

[10] Gurzenda restates the same three arguments in her reply, but she provides further clarification. For example, with the error in Step Five, she mentions that "[t]he opinion of an examining physician is . . . entitled to weight greater than the opinion of a non-examining physician," suggesting that the state agency doctors should not have been given great weight as they are "non-examining consultants." Reply at 3 (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).

[11] Like the ALJ, the Commissioner erroneously refers to Dr. Blank as "Dr. Black."

1    correlation . . . with clinical signs, laboratory findings, or treatment notes" and Dr. Gowra "did not

2    note any specific functional limitations." *Id.* The Commissioner further contends that "the ALJ

3    was not required to incant magic words" when explaining why Gurzenda did not meet the

4    "paragraph C" listing. *Id.* at 9 (citing *Abreu v. Astrue*, 303 F. App'x 556, 557 (9th Cir. 2008)). He

5    states since the ALJ "did discuss the evidence in her decision . . . there is no error." *Id.* at 10.

6        The Commissioner next argues that "[t]he ALJ properly developed the record to the extent

7    possible." *Id.* at 11. The Commissioner asserts that "there was a dearth of actual treatment

8    records available," and that even with those records, "development back to 2005 is not only

9    unwarranted, but precluded because, as the current ALJ noted, [Gurzenda's] failure to appeal the

10   administrative denial of her prior application made that decision administratively final." *Id.*

11       Finally, the Commissioner contends that "[t]he ALJ properly evaluated [Gurzenda's]

12   ability to work at Step 5." *Id.* at 12. He states the "only medical opinion that posited specific

13   functional limitations" was by Dr. Blank, and that was rejected by the ALJ "based on internal

14   inconsistencies in the opinion" and thus appropriately excluded from the hypotheticals to the

15   vocational expert. *Id.* at 13 (citing *Greger v. Barnhart*, 64 F.3d 968, 973 (9th Cir. 2006)).

16        The Commissioner argues that the ALJ's decision should be affirmed. *Id.* at 14. If the

17   Court disagrees, however, the Commissioner contends that "the proper remedy is a remand for

18   further proceedings, not for an immediate payment of benefits." *Id.*

19   **III.    ANALYSIS**

20       **A.    Legal Standard Under 42 U.S.C. §§ 405(g) and 1383(c)(3)**

21       District courts have jurisdiction to review the final decisions of the Commissioner and

22   have the power to affirm, modify, or reverse the Commissioner's decisions, with or without

23   remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

24       When asked to review the Commissioner's decision, the Court takes as conclusive any

25   findings of the Commissioner which are free from legal error and supported by "substantial

26   evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind

27   might accept as adequate to support a conclusion," and it must be based on the record as a whole.

28   *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "'Substantial evidence' means more than a

mere scintilla," *id.*, but "less than a preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (citation omitted). Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits. *See Garrison v. Colvin*, 759 F.3d 995, 1019–21 (9th Cir. 2014).

## B. The ALJ Improperly Weighed Certain Medical Opinion Evidence

### 1. Legal Standard for the Evaluation of Medical Opinions

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "[T]he opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.[12]

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citations omitted). "[T]he opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of

---

[12] The regulations governing treatment of medical evidence have been amended with respect to applications filed on or after March 27, 2017. *Compare* 20 C.F.R. § 404.1527 *with* 20 C.F.R. § 404.1520c. Because Gurzenda filed her application before that date, the older framework applies here, and this order need not consider what effect the regulatory change has on Ninth Circuit precedent regarding the weight afforded to different categories of medical opinions.

the opinion of either an examining physician *or* a treating physician." *Id.* at 1202 (quoting *Lester*, 81 F.3d at 831). The Ninth Circuit has emphasized the high standard required for an ALJ to reject an opinion from a treating or examining doctor, even where the record includes a contradictory medical opinion:

> "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* This is so because, even when contradicted, a treating or examining phyisician's opinion is still owed deference and will often be "entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick* [*v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)]. "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).
>
> Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996). In other words, an ALJ errs when he rejects a medical opinion or assigns it very little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion. *See id.*

*Garrison*, 759 F.3d at 1012–13. Thus, failure to mention a treating physician's opinion without providing specific and legitimate reasons supported by substantial evidence constitutes an error. *Id.*; *see also Marsh v. Colvin*, 792 F.3d 1170, 1172–73 (9th Cir. 2015) ("Because a court must give 'specific and legitimate reasons' for rejecting a treating doctor's opinions, it follows even more strongly that an ALJ cannot in its decision totally ignore a treating doctor and his or her notes, without even mentioning them.").

### 2. Legal Standard for Evidence that Predates the Onset Date of Disability

"Medical opinions that predate the alleged onset disability are of limited relevance." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008) (citing *Fair v. Bowen*, 885 F.2d 597, 600 (9th Cir. 1989)). The Ninth Circuit has held, however, that the ALJ is required to consider "all medical opinion evidence." *Tomasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527(b)). In an unpublished opinion, the Ninth Circuit

applied this rule to include evidence that predates the alleged onset date of disability. *See Williams v. Astrue*, 493 F. App'x 866, 868 (9th Cir. 2012). In another unpublished opinion, the Ninth Circuit held that the ALJ may reject medical evidence that predates the alleged onset disability date "in favor of more recent opinions" when the more recent medical opinion recent evidence is "consistent with the record as a whole." *Brown v. Comm'r of Soc. Sec.*, 532 F. App'x 688, 689 (9th Cir. 2013) (citation and internal quotation marks omitted). This Court is unaware of published Ninth Circuit authority addressing the issue and finds the reasoning of the memorandum dispositions in *Williams* and *Brown* persuasive.

### 3. Legal Standard for the Evaluation of Other Sources

Social workers and therapists are categorized as "other sources" since they are not considered "acceptable medical sources" under current regulations. *See* 20 C.F.R. § 416.913; *Mack v. Astrue*, 918 F. Supp. 2d 975, 982 (N.D. Cal. Jan. 15, 2013) ("A social worker, even a licensed clinical social worker, is not an acceptable medical source under the regulations and therefore cannot be given great or controlling weight."). However, the Ninth Circuit has held that "[i]n addition to considering the medical opinions of doctors, an ALJ must consider the opinions of medical providers who are not within the definition of 'acceptable medical sources.'" *Revels v. Berryhill*, 874 F.3d 648, 655 (9th Cir. 2017) (citations omitted). "While those providers' opinions are not entitled to the same deference, an ALJ may give less deference to 'other sources' only if the ALJ gives germane reasons to each witness for doing so." *Id.* (citing *Molina*, 674 F.3d at 1111). In some circumstances, "an opinion from a medical source who is not an acceptable medical source . . . may outweigh the medical opinion of an acceptable medical source, including the medical opinion of a treating source." 20 C.F.R. §§ 404.1527(f)(1), 416.927(f)(1). "For example, it may be appropriate to give more weight to the opinion of a medical source who is not an acceptable medical source if he or she has seen the individual more often than the treating source, has provided better supporting evidence and a better explanation for the opinion, and the opinion is more consistent with the evidence as a whole." *Id.*

### 4. Jeremy Blank, Psy.D.

Gurzenda argues that the ALJ incorrectly "made a mental determination as to residual

United States District Court
Northern District of California

functional capacity independently" when she did not take Dr. Blank's opinion into account. Reply at 3. Gurzenda contends that "Dr. Blank tested [her] and determined she has moderate/severe limitations," which could be "functionally debilitating," and that "[her] inability to appropriately work with coworkers, supervisors and the public, adapt to changes, hazards or stressor prevent her from sustaining work." *Id.*; *see* AR 481. Gurzenda states that Dr. Blank's evaluation also supports the opinions of Drs. Khanzode and Gowra, who suggest she is incapable of work. Reply at 3. In her decision, the ALJ discussed Dr. Blank's findings in some detail:

> On October 11, 2016, consultative psychologist Jeremy Black [sic], presumably Ph.D., reported that he had received no medical records to review prior to the interview and mental status evaluation. The claimant was described as cooperative, as she made good eye contact, and displayed intact gross motor function, good grooming, *appropriate* interaction, coherent speech, normal intelligence, *unimpaired* concentration, intact, linear, and logical thought processes, and mildly impaired memory. Dr. Black [sic] did note some suggestion of delusional thought content and hypomanic mood . . . . However, the undersigned finds the conclusory assessments of moderate and moderate to severe mental limitations to be internally inconsistent such as that the claimant's concentration, intelligence, and attention were considered "unimpaired" and the claimant's interaction with the interviewer, was "appropriate" during the actual mental status evaluation, and so forth.

AR 19. Throughout her decision, the ALJ continued to refer to the results from Dr. Blank's mental status evaluation as support for a finding of no disability, and she weighed this evidence quite heavily. *See id.* at 20–22. However, the ALJ rejected Dr. Blank's opinion that Gurzenda had "moderate to severe mental limitations" as it was "internally inconsistent" with the mental evaluation and he was a "one-time evaluating consultative psychologist who had admittedly, not reviewed any medical records for the claimant." *Id.* at 22.

To the extent that the ALJ rejected Dr. Blank's opinion, she provided sufficient reasons for doing so. The first reason, namely that Dr. Blank's opinion was "internally inconsistent" with the results from the mental evaluation, was supported by evidence from the record. Gurzenda scored within "the intact range" on her mental evaluation, with the only concerns being that she struggled with calculations and had some trouble with her memory. *Id.* at 480. Despite these issues, Dr. Blank concluded that during the examination Gurzenda "had no difficulty following simple or complex directions." *Id.* However, he later contradicted himself in his medical source statement,

reporting that she was "mildly impaired" when it came to following complex instructions. *Id.* at 481. There were other inconsistences as well, such as Dr. Blank's note that her concentration was "unimpaired" during the mental examination, contrasting with his medical source statement that Gurzenda's concentration is "moderately impaired." *Id.* Furthermore, Dr. Blank stated Gurzenda was functionally and emotionally "moderately to severely impaired," with no explanation of what led him to that conclusion. *Id.* at 481. As Gurzenda's self-reported issues of Morgellons, PTSD, and bipolar disorder, were not readily apparent during the "mini-mental state examination," Dr. Blank likely gave great weight to her testimony as it provided greater support for this finding than the mental examination itself. *Id.* at 479–481. As Dr. Blank's opinion is not supported by the clinical evidence, the ALJ properly discredited his opinion. *See Marchand v. Berryhill*, No. 2:16-cv-00156-RHW, 2017 U.S. Dist. LEXIS 20225, at *11 (E.D. Wash. Feb. 13, 2017) ("An ALJ may properly discredit a doctor's opinion if it is contradicted by objective evidence or other findings."); *see Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (finding that a clear and convincing reason for rejecting a doctor's opinion is present when the opinion was contradicted by the doctor's own observations).

The ALJ also noted that Dr. Blank failed to review Gurzenda's medical record prior to her visit and only evaluated her once. AR at 19, 22. Standing alone, neither of those limitations would be sufficient to discount Dr. Blank's conclusions. *See, e.g.*, *Thompson v. Berryhill*, No. 17-305 (BAT), 2017 WL 4296971, at *3 (W.D. Wash. Sept. 28, 2017) (holding that an ALJ erred in rejecting medical opinions based on a single examination); *Sorg v. Astrue*, No. C09-5063 (KLS), 2009 WL 4885184, at *8 (W.D. Wash. Dec. 16, 2009) (same). In this case, however, where nothing in Dr. Blank's summary of his mental status evaluation supports his conclusions regarding Gurzenda's impairments, the ALJ did not err in noting that Dr. Blank lacked any other foundation on which he could have based those opinions.

The Court finds no reason to reverse the Commissioner's determination based on the ALJ's rejection of Dr. Blank's opinion.

### 5. Leena Khanzode, M.D.

Gurzenda contends that the ALJ improperly weighed Dr. Khanzode's opinion and "has not

provided a logical bridge between the findings of [her] psychiatrists and her mental residual functional capacity." Gurzenda's Mot. at 11–12. Gurzenda argues that Dr. Khanzode's opinion that she "may not [be] able to work fulltime" due to her "[p]sychotic disorder," should not have been discounted by the ALJ. *See* Reply at 6; AR 554. In her decision, the ALJ discussed the numerous visits to Dr. Khanzode's office in some detail. The ALJ noted:

> On March 1, 2017, Leena Khazode [sic], M.D. provided two sentences in a letter in support of [Gurzenda], indicating that due to her psychotic disorder, "she may not been [sic] able to work full-time . . ." . . . This letter was conjoined with a GA (general assistance) form of the county program . . . but there was no correlation of these conclusions with clinical signs or laboratory findings, either from treatment notes or laboratory findings.

> In an office visit on April 5, 2017, [Gurzenda] reported that with medical compliance, she was now "less depressed, crying less" and her appetite was good, as she "works as a caregiver part time." There was no "significant change" noted on mental status evaluation, as [Gurzenda] assured that she was taking medications as prescribed and had no adverse side effects. For treatment of her assessed "psychotic disorder with delusions due to know physical condition," [Gurzenda] was advised only to exercise and to eat healthy . . . .

> On June 15, 2017, [Gurzenda] returned for another office visit and repeated that she was taking medications as prescribed, without adverse side effects. [Gurzenda] complained of inadequate housing and feeling overwhelmed, so her prescribed dosage of Prozac was increased . . . .

AR 19–20. Although the ALJ referenced Khanzode's opinion throughout her decision, she discounted it because "the medical source statement . . . [was] markedly non-compliant with the requirements of disability as directed by the Social Security Act" and "[t]here was no exact function by function analysis by [Dr. Khanzode], or any medical foundation or dates of laboratory or treatment note findings to serve as medical foundation for the conclusions." *Id.* at 21–22.

The ALJ's main argument for discounting Dr. Khanzode's opinion is that it is not supported by medical evidence.[13] However, the record shows Gurzenda had gone to see Dr.

---

[13] The ALJ also concluded that the "conjoined" GA form with Dr. Khanzode's March 1, 2017 letter was "markedly non-compliant with the requirements of disability as directed by the Social Security Act." AR 21–22. The exhibit that the ALJ cites, however, includes only the one-page cover letter followed by a page of instructions for the GA form; it does not include an actual GA form completed by Dr. Khanzode. *Id.* at 555.

Khanzode four times since filing her application, and although no laboratory tests were conducted at any of those visits, Dr. Khanzode provided treatment notes that supported her opinion. On August 17, 2016, Dr. Khanzode wrote that Gurzenda "does not feel well to do activities" and has been "anxious recently." *Id.* at 534. She also diagnosed Gurzenda with "[p]sychotic disorder w[ith] delusions due to known physi[cal] cond[itions]," "[i]nadequate housing," and "[p]roblem related to social environment, unspecified." *Id.* at 535. As a result of Gurzenda's testimony and Dr. Khanzode's own evaluation, she prescribed Gurzenda medication and started her on a treatment "plan." *Id.* at 535–36. On October 5, 2016, Dr. Khanzode assessed Gurzenda again and found that her symptoms were the same, but that this time she was in so much pain that she "wanted to leave early from [the] visit." *Id.* at 537. Dr. Khanzode altered the treatment plan and increased her medication. *Id.* at 538. On April 5, 2017, Dr. Khanzode noted that Gurzenda was "less depressed" and "crying less," but there were "no" changes in her medical status since her last visit. *Id.* at 543. Dr. Khanzode again increased her medication and encouraged Gurzenda "to exercise and eat healthy." *Id.* at 544. On June 15, 2017, Dr. Khanzode reported a "notable change in mood/affect" in Gurzenda from the last visit and said she was more "depressed." *Id.* at 558. She again increased her medication. *Id.* These records indicate that Dr. Khanzode was consistently "treating" Gurzenda and that Gurzenda was in pain and struggling to function normally, so much so that Dr. Khanzode had to prescribe, and on some occasions increase, medication. Additionally, in her most recent visit, Dr. Khanzode reported Gurzenda had gotten worse since her last appointment. This suggests her disorder was getting worse despite constant treatment and provides greater support for Dr. Khanzode's assessment of potential disability.

The ALJ erred when she incorrectly discounted Dr. Khanzode's opinion as there was medical evidence in the record to support her finding that Gurzenda may not be able to work full time because of her mental issues. *See Smith v. Astrue*, 2009 U.S. Dist. LEXIS 49244, 2009 WL 1653032, at *5 (C.D. Cal. June 10, 2009) ("It is improper to reject a treating physician's opinion where he provided at least some objective observations and testing in addition to subjective opinions."). Generally, the opinions of treating physicians are heavily weighted "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal

picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). Since this application was filed prior to March 27, 2017, the "treating physician rule" applies, and the opinions of Gurzenda's treating physician should be given special deference and "may be disregarded only for clear and convincing reasons based on substantial evidence in the record." *See Lamantia v. Voluntary Plan Adm'rs, Inc.*, 401 F.3d 1114, 1121 (9th Cir. 2005). Dr. Khanzode provided treatment notes that supported her March 1, 2017 letter stating Gurzenda "may not [be] able to work fulltime" due to her "[p]sychotic disorder." *See Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (finding, in the context of a disability claim based on depression, that when the treating physician diagnosed the claimant with depression, set forth clinical observations supporting the diagnosis, and prescribed psychotherapeutic drugs, the ALJ erred in finding that the claimant had not set forth sufficient evidence to substantiate the mental impairment). The ALJ failed to address Dr. Khanzode's notes indicating that Gurzenda's condition did not improve in response to treatment, and the ALJ did not provide clear and convincing reasons to discount Dr. Khanzode's opinions.

### 6. Veena Gowra, M.D.

Gurzenda argues that the ALJ improperly discounted Dr. Gowra's finding that she is permanently disabled. *See* Reply at 3. Like with Dr. Khanzode, the ALJ afforded little weight to Dr. Gowra's opinion as she "did not explain the medical reasons or clinical signs and laboratory findings on which she based [her] conclusion." AR 20, 22. The ALJ also notes that Gurzenda's appointment on the date that Dr. Gowra sent in the GA form "was classified as a visit for 'pain' and the topics discussed were essential hypertension—primary and situational stress, but no specific limitations were assessed or noted in that date's appointment summary." *Id.* at 20.

The primary reason the ALJ attributed little weight to Dr. Gowra's opinion is because it was not supported by medical evidence. The record shows that Gurzenda went to see Dr. Gowra twice since filing her application, once on December 15, 2016 for "right ear pain" and once on June 20, 2017 for "pain" relating to hypertension and stress. *Id.* at 518, 562. Although her history

of Morgellons was brought up, the only treatment conducted at these visits was in relation to her ear pain, hypertension, and stress. *See id.* at 517–26, 562–63. Significant laboratory tests were conducted on her first visit, but none of the tests related to her Morgellons or mood disorder, which are the primary arguments for disability in this case. *See id.* at 517–26. As Gurzenda does not challenge the ALJ's decision that Gurzenda's ear infections and hypertension were merely "other reported conditions" and "non-severe" impairments, not discussed past Step Two, these laboratory tests do not support Gurzenda's disability claim based on Morgellons or her mood disorder. *See* 20 C.F.R. §§ 416.921, 416.922. As such, Dr. Gowra's finding of Gurzenda being "eligible for permanent disability" and "incapable of low stress jobs" is not supported by the medical evidence from these two visits alone. The ALJ did not err in discounting Dr. Gowra's opinion. *See Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (holding an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record or by objective medical findings). Furthermore, Dr. Gowra's two-sentence letter to the Social Security Administration certifying that Gurzenda "is eligible for permanent disability" is vague and provides no explanation for why she would be disabled, thus further supporting that the ALJ's properly discounted her opinion. AR at 561; *see Saelee v. Chater*, 94 F.3d 520, 523 (9th Cir. 1996) (finding, in the context of a letter that had been solicited by the claimant's counsel, that an ALJ did not err in rejecting a treating physician's opinion when it "is worded in such a way that it strikes [her] as an effort by the physician to assist a patient even though there is no objective medical basis for the opinion").

### 7. S. Khan, M.D. and Alan Berkowitz, M.D.

Gurzenda contends that the ALJ erred when she allocated great weight to the opinions of the non-examining state agency doctors, Drs. Khan and Berkowitz, over those of the examining and treating doctors, Drs. Blank, Khanzode, and Gowra. Reply at 3–4. In her decision, the ALJ states she "accords significant reliance to the assessments by the DDS evaluators." AR 21. In support of this reliance, the ALJ points to her reasoning for discounting the examining doctors' opinions, discussed above.

"An ALJ does not commit legal error per se solely by according greater weight to the

opinion of a nonexamining State agency physician than to the contradictory opinion of a treating physician." *Jessica L. v. Berryhill*, No. CV 18-3530-KS, 2019 U.S. Dist. LEXIS 99472, at \*7 (C.D. Cal. June 12, 2019); *see, e.g.*, *Morgan v. Comm'r of. Soc. Sec. Admin.*, 169 F.3d 595, 600–03 (9th Cir. 1999). While the opinions of the non-examining doctor may be heavily weighed if there are legitimate reasons to discredit the examining and treating physicians' opinions, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831. Because the ALJ has not identified other sufficient reasons to discredit Dr. Khanzode's opinions, the contrary opinions of Drs. Khan and Berkowitz cannot take precedence. The ALJ erred in relying "significant[ly]" on their opinions but allocating "some but less reliance" to Dr. Khanzode. AR 21.

\* \* \*

For the reasons discussed above, the Court concludes that the ALJ erred in improperly discounting the opinion of Dr. Khanzode and giving controlling weight to the non-examining state agents, Drs. Khan and Berkowitz.

### C.    The ALJ Failed to Properly Develop the Record

Gurzenda argues that the ALJ "failed to develop the record" by excluding her medical records dating back to 2005. *See* Gurzenda's Mot. at 10. Gurzenda contends that her full history of treatment supports her application, especially with respect the paragraph C criteria. *See id.* at 10–11. To meet the paragraph C criteria of Listing 12.04, Gurzenda must show a "a medically documented history of the existence of the disorder over a period of at least 2 years" and evidence of both: (1) "rel[iance], on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of [her] mental disorder;" and (2) "despite [her] diminished symptoms and signs, [she has] achieved only marginal adjustment . . . that is, [she has] minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life." 20 C.F.R. Pt. 404, Subpt. P, App. 1 at 12.04C. Although the ALJ was correct that the denial of Gurzenda's previous applications, which she failed to appeal, preclude a finding that she was disabled before the date of

her current application, medical evidence from that earlier period may be relevant to determine whether Gurzenda has achieved more than marginal adjustment as a result of continuous treatment, and the ALJ should have considered such evidence.

Gurzenda also correctly argues in her reply that "an ALJ has 'a duty to conduct an appropriate inquiry' if she believes she needs to know the basis of a treating physician's opinions to evaluate them." Reply at 4 (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001)); *see also Coelho v. Astrue*, No. C 10-02102 JSW, 2011 WL 3501734, at *7 (N.D. Cal. Aug. 10, 2011) (citing *Smolen*, 80 F.3d at 1288). Here, as discussed above, Dr. Blank's report included conclusions regarding Gurzenda's limitations that did not appear to be supported by the results of his mental status evaluation, and it was not clear how Dr. Blank reached those conclusions. Nevertheless, Dr. Blank was hired by the Commissioner to evaluate Gurzenda, and he concluded that she had significant limitations. If the ALJ was not satisfied with his evaluation, the ALJ should have requested clarification of how he reached his conclusions, or perhaps should have arranged for a separate evaluation by a different psychologist.

Finally, the record and the ALJ's decision include references to a general assistance form completed by Dr. Khanzode, but the form itself does not appear to have been included in the record. *See* AR at 555 (instructions for form). The ALJ should have inquired as to whether such a form exists.

Although the Commissioner might well be correct that some of the medical records Gurzenda suggests have been omitted may simply not exist, *see* Opp'n at 11–12, the Court concludes that the ALJ did not sufficiently develop the record

## D. Whether This Court Should Remand for Further Administrative Proceedings or an Award of Benefits

Gurzenda requests that her case be remanded for an award of benefits based on the "credit as true" rule, or in the alternative, remanded for further administrative proceedings. Gurzenda's Mot. at 12.

Once a district court has determined that an ALJ has erred, the court must decide whether to remand for further proceedings or to remand for immediate award of benefits. *Harman v. Apfel*,

211 F.3d 1172, 1177–78 (9th Cir. 2000). Under this Circuit's "credit as true" rule, a court must credit as true evidence that was rejected and remand for an immediate award of benefits if "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id.* at 1178 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996)). On the other hand, a court should remand for further proceedings when "the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act" or where "there is a need to resolve conflicts and ambiguities." *Garrison*, 759 F.3d at 1021; *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014).

As discussed above, the ALJ failed to provide legally sufficient reasons for discounting the opinion of Gurzenda's treating physician, Dr. Khanzode, with respect to Gurzenda's symptoms and limitations. However, even if properly credited, the Court does not find that Dr. Khanzode's treatment records and opinion would necessarily make "clear" that Gurzenda is disabled. While Dr. Khanzode's records of Gurzenda's treatment evince severe symptoms, the limitations they have created on Gurzenda's ability to work are unclear, and even Dr. Khanzode's short letter regarding Gurzenda's application for benefits is equivocal as to whether Gurzenda "may" be able to work. AR at 554. The Court therefore remands for further proceedings to allow the Commissioner to consider more fully Dr. Khanzode's treatment records and to complete the record. *See Dominguez v. Colvin*, 808 F.3d 403, 410 (9th Cir. 2016) (holding that a district court did not abuse its discretion in remanding to the ALJ for further proceedings where there were "gaps in the record").

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## IV.    CONCLUSION

For the reasons stated above, the Court GRANTS Gurzenda's Motion for Summary Judgment, DENIES the Commissioner's Motion for Summary Judgment, and REMANDS this case for further administrative proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: September 25, 2019

JOSEPH C. SPERO
Chief Magistrate Judge